UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TIFFANY M. *o/b/o* M.M.,[1]

    Plaintiff,

    v.

FRANK BISIGNANO,
*Commissioner of Social Security*,[2]

    Defendant.

Case No. 1:22-cv-2807-MJS

**MEMORANDUM OPINION**

    Plaintiff Tiffany M. ("Ms. M") challenges the Social Security Administration's ("SSA") denial of an application for supplemental security income ("SSI") benefits for her minor child, MM. She argues that the Administrative Law Judge ("ALJ") wrongly found that MM did not satisfy the SSA's functional-equivalence standards for disability and says the ALJ's findings were not supported by substantial evidence. On review, the Court concludes that the ALJ did not adequately explain how they weighed the applicable evidence surrounding two of the functional-equivalence factors and neglected to discuss at least some aspects of the relevant evidence altogether. Accordingly, the Court **GRANTS** Ms. M's motion for judgment of reversal (ECF No. 24), **DENIES** the Commissioner's motion for judgment of affirmance (ECF No. 26), and **REMANDS** this case to the Commissioner for further proceedings consistent with this opinion.

---

[1] The names of Plaintiff and her child have been partially redacted in keeping with the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States. *See* Memorandum, Privacy Concern Regarding Social Security and Immigration Opinions 3 (May 1, 2018), https://www.uscourts.gov/sites/default/files/18-ap-c-suggestion_cacm_0.pdf (recommending the use of "only the first name and last initial" in Social Security cases).

[2] The current Commissioner is automatically substituted as the named defendant. Fed. R. Civ. P. 25(d).

1

## BACKGROUND

I.     **Factual Overview**

MM is a minor child diagnosed with asthma, selective mutism, speech delay, attention deficit hyperactivity disorder ("ADHD"), and specific learning disabilities in reading, math, and written expression. (ECF No. 14, Administrative Record ("AR") at 381–86.)[3] Over the years, MM has received a variety of medical treatments and interventions to treat her asthma and its related symptoms. In addition, MM took part in a range of developmental evaluations, including with District of Columbia Public Schools ("DCPS"), and broadly speaking, those evaluations pointed to certain developmental delays for MM. Relatedly, based on its assessments, DCPS has regularly developed individualized education plans ("IEPs") for MM that provide specialized school instruction, assistive technology for communication, and other supports.

II.     **The ALJ Decision**

To qualify for SSI benefits under the Act, a claimant under eighteen years of age must demonstrate a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and … which has lasted or can be expected to last for a continuous period" of at least one year. 42 U.S.C. § 1382c(a)(3)(C)(i). Under the Act's implementing regulations, a three-step analytical framework governs that analysis. 20 C.F.R. § 416.924. The SSA considers whether: (1) the claimant has engaged in "substantial gainful activity," (2) the claimant has an impairment or combination of impairments that are "severe," and (3) the impairment or combination of impairments "meet, medically equal, or functionally equal" a listed impairment. *Id.* § 416.924(b)–(d); *see Sullivan v. Zebley*, 493 U.S. 521, 525–26 (1990).

---

[3] Page citations to the AR refer to the running pagination at the lower right margin. Page citations to the parties' briefing, by contrast, refer to the ones assigned by the Court's electronic filing system.

The ALJ employed this three-step framework here. (AR at 22–36.) At step one, the ALJ noted that MM had not engaged in substantial gainful activity since the application date. (*Id.* at 23.) At step two, the ALJ found that MM had a multitude of "severe" impairments, including: "attention deficit hyperactivity disorder (ADHD), cognitive development delay, selective mutism, language delay, learning disability … seasonal allergies, eczema, asthma, rhinitis, sleep disordered breathing, and atopic dermatitis." (*Id.*) At step three, the ALJ concluded that MM did not have an impairment or combination of impairments that met or medically equaled a listed impairment (*id.* at 23–25), so the ALJ then proceeded to analyze whether MM's impairments functionally equaled a listed impairment (*id.* at 25–36). That latter half of the step-three analysis—the functional-equivalence aspect—is where Ms. M focuses her arguments for reversal.

To determine if an impairment is "functionally equivalent" to a listed impairment, the SSA evaluates whether the claimant's limitations are "marked" or "extreme" across six functional domains: "(i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for yourself; and (vi) health and physical well-being." *See* 20 C.F.R. § 416.926a(b)(1) (cleaned up). To "functionally equal" a listed impairment, a child must have "marked" limitations in at least two domains, or an "extreme" limitation in at least one. *Id.* § 416.926a(a). A "marked" limitation—one that is "more than moderate" but "less than extreme"—is a limitation that "interferes seriously" with a child's "ability to independently initiate, sustain, or complete activities." *Id.* § 416.926a(e)(2)(i). From a standardized-testing perspective, a "marked" limitation is "the equivalent of the functioning" associated with "scores that are at least two, but less than three, standard deviations below the mean." *Id.* An "extreme" limitation is one that "interferes very seriously" with a child's "ability to independently initiate, sustain, or complete activities." *Id.* § 416.926a(e)(3)(i). It is the rating

3

assigned "to the worst limitations," though it "does not necessarily mean a total lack or loss of ability to function." *Id.* From a standardized-testing perspective, it is "the equivalent of the functioning" associated with "scores that are at least three standard deviations below the mean." *Id.*

Here, in assessing the six functional areas relevant to the analysis, the ALJ concluded that MM had "no limitation" in the domain of moving about and manipulating objects and "less than marked" limitations in the other five domains. (*See* AR at 26.) The ALJ's findings across four of these domain areas—acquiring and using information, attending and completing tasks, interacting and relating with others, and health and physical well-being—are at issue in this case.[4] The Court summarizes the ALJ's treatment of each of these domains in turn.

A.   **Acquiring and Using Information**

As to MM's ability to acquire and use information, the ALJ's discussion began by describing a range of evidence, including scores on various intelligence, developmental, and achievement tests; MM's school-related IEPs from 2017 to 2020; MM's speech and psychological assessments; and Ms. M's testimony. (AR at 28–31; *see also id.* at 49–58, 245–49, 436–527, 814–61, 862–74, 1066–92, 1475–86.) The test scores, specifically, included Wechsler Intelligence Scale for Children scores that were "borderline to low average," and Battelle Development Inventory, 2nd Edition (BDI-2)[5] scores reflecting low average adaptive functioning and "significantly delayed … personal social and cognitive" functioning. (*Id.* at 28.) Although not mentioned by the ALJ, MM's cognitive function scores on the BDI-2 test were more than two standard deviations

---

[4] In other words, Ms. M does not challenge the ALJ's findings of (1) a "less than marked" limitation as to MM's ability to care for herself or (2) no limitation as to MM's ability to move and manipulate objects.

[5] The BDI-2 "is a standardized assessment designed to measure development across five domains: Adaptive, Personal-Social, Communication, Motor, and Cognitive." (AR at 858 n.2.)

below the mean. (*Id.* at 856.) More, MM's "Day-C Communication Domain … indicated 'very poor' functioning" (*id.* at 29), and some of her scores on the Woodcock Johnson Test of Achievement, Fourth Edition ("WJ-IV") ranged from "extremely low" to "average" (*id.* at 30).

The ALJ recognized that MM's IEPs showed poor cognitive functioning and an inability to speak at school, such that she instead "communicates with gestures and a communication board." (*Id.* at 28.) The ALJ noted MM's significant "absenteeism" from school, in part because of her health issues. (*Id.* at 30.) And the ALJ identified MM's speech and psychological assessments, which emphasized her "'very poor' functioning" in communication. (*Id.* at 29.) On one evaluation, MM did not complete the second half of a WJ-IV test; the evaluator said that could indicate "extremely low" academic functioning (*id.* at 32, 1477–80), but the ALJ assessed that MM's inability to complete the test appeared to be "due to inattention and low persistence" (*id.* at 31). In considering other test scores, the ALJ noted MM's "selective mutism, poor persistence, short attention span, and unwillingness to participate during portions of the testing may skew her test results." (*Id.* at 31.) The ALJ also described MM's ability to follow short instructions and communicate through an iPad in the classroom and a chat box during online class. (*Id.*)

All told, after ticking through various aspects of the evidentiary record, the ALJ concluded by stating that MM's "several psychological evaluation reports, the intelligence testing, and the IEP documents support 'less than marked' limitations in this area of functioning." (AR at 31.)

### B.    Attending and Completing Tasks

As to MM's ability to attend to and complete tasks, the ALJ referenced the following evidence: MM's ADHD diagnosis; descriptions of MM's attention capacity from her mother and her general education teacher; aspects of MM's school-related IEPs; observations from one of MM's psychoeducational evaluations; and evidence that MM played with other children, played

5

video games, and went to school online during the pandemic. (AR at 31–32.) The ALJ recounted Ms. M's statements that MM did not stay focused on schoolwork or chores, did not stay engaged with tasks, and did not work on arts and crafts. (*Id.* at 32, 406.) The ALJ seemingly contrasted this evidence with information from MM's teacher, who said that MM could stay focused on arts and crafts projects. (*Id.* at 32.) The ALJ also referenced a psychoeducational evaluation of MM, which noted that her academic functioning was likely hampered because she was "distracted[] and unwilling to complete difficult[] tasks." (*Id.*) The ALJ concluded as follows: "Based on the IEP accommodations, the psychological examination reports, the mental status examinations, the remarks from the evaluating mental health practitioners, and Ms. M[]'s testimony," MM exhibited a "less than marked" limitation in this area. (*Id.*)

### C. Interacting and Relating with Others

As to MM's ability to interact with others, the ALJ largely focused on Ms. M's testimony, along with MM's psychological and speech evaluations. The ALJ discussed MM's selective mutism, noting that while MM generally does not speak at school, she speaks at home with family. (AR at 32–33.) The ALJ found that the "psychological evaluations and speech evaluations in the record show [MM] can communicate effectively non-verbally." (*Id.* at 33.) The ALJ noted that MM's school-related IEP services include a chat-board and speech therapy, and that she otherwise communicates at school through gestures, nods, and facial expressions. (*Id.*) In balancing these points, the ALJ found that MM had a "'less than marked' limitation" in this area. (*Id.*)

### D. Health and Physical Well-Being

Finally, in addressing MM's health and well-being, the ALJ engaged with a variety of medical records. The ALJ examined MM's "history of seasonal allergies, eczema, asthma, rhinitis, sleep disordered breathing, and atopic dermatitis," which as a whole impact her "ability to perform

6

age[-]appropriate tasks." (AR at 33.) As to MM's asthma, the ALJ considered various test results and imaging, as well as reports from her hospital visits. (*Id.* at 34.) The ALJ highlighted that Ms. M does not always administer MM's asthma medication properly, although this seemed to improve by September 2020. (*Id.*) The ALJ concluded that MM's asthma affects her functioning but responds to properly administered medication, noting that MM could still engage in activities such as running and riding a bike. (*Id.*) As to MM's eczema and atopic dermatitis, the ALJ briefly noted that those ailments were not marked or extreme in light of her doctor's recommendation of over-the-counter treatments. (*Id.*) The ALJ briefly considered MM's selective mutism, stating that it impacted MM's academic performance but not her overall health. (*Id.*) All in all, the ALJ found that MM had a "less than marked" limitation in this domain. (*Id.* at 35.)

\*   \*   \*

Based on these findings (and other findings that Ms. M does not challenge), the ALJ concluded that MM did not have a combination of impairments that functionally equaled a listing, so she was not "disabled" under the Act and therefore not entitled to benefits. (AR at 36.)

### III.   Procedural History

Following the ALJ's decision, the Appeals Council denied Ms. M's request for review, rendering the ALJ's decision final. (*Id.* at 1.) Pursuant to 42 U.S.C. § 405(g), Ms. M—on behalf of MM—now seeks judicial review and asks the Court to reverse or, alternatively, remand to the SSA. (*See* ECF No. 24 ("Pl.'s Mem."); *see also* ECF No. 28 ("Pl.'s Reply").) The Commissioner filed a cross-motion to affirm. (*See* ECF No. 26 ("Def.'s Mem.").) This ruling now follows. [6]

---

[6] Plaintiff filed an initial motion for reversal before the prior presiding judge ruled on an unopposed extension request, so the Court gave Plaintiff a chance to refile an amended motion, which Plaintiff did. The Court focuses on the refiled motion and **DENIES AS MOOT** Plaintiff's original motion (ECF No. 21).

**LEGAL STANDARD**

"The Commissioner's 'ultimate determination' about entitlement to benefits 'will not be disturbed if it is based on substantial evidence in the record and correctly applies the relevant legal standards.'" *Cox v. Kijakazi*, 77 F.4th 983, 990 (D.C. Cir. 2023) (quoting *Butler v. Barnhart*, 353 F.3d 992, 999 (D.C. Cir. 2004)). In other words, the Court reviews the Commissioner's denial of benefits to determine whether it was supported by substantial evidence and free of legal error.

Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (citation and quotation marks omitted). It is "more than a scintilla, but … less than a preponderance." *Butler*, 353 F.3d at 999 (quoting *Fla. Mun. Power Agency v. FERC,* 315 F.3d 362, 365–66 (D.C. Cir. 2003). The Court must "carefully scrutinize" the record for substantial evidence, but it may not reweigh the evidence considered, *Cunningham v. Colvin*, 46 F. Supp. 3d 26, 32 (D.D.C. 2014) (citation and quotation marks omitted), because its review of the evidence is "highly deferential to the agency fact-finder," *Rossello ex rel. Rossello v. Astrue*, 529 F.3d 1181, 1185 (D.C. Cir. 2008) (citing *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)).

To ensure a reviewing court can "assess the validity of the agency's ultimate findings," an ALJ must build an "accurate and logical bridge from the evidence" to their conclusions. *Lane–Rauth v. Barnhart*, 437 F. Supp. 2d 63, 67 (D.D.C. 2006) (quoting *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)). Put another way, an ALJ must sufficiently show their work: "the weighing of the evidence" cannot merely take "place inside the ALJ's head." *Bethel ex rel. C.B. v. Berryhill*, 2019 WL 12251881, at *9 (D.D.C. Aug. 29, 2019) (citation and quotation marks omitted), *report and recommendation adopted*, 2019 WL 12251879 (D.D.C. Oct. 10, 2019). An ALJ must set forth an analysis "connecting the evidence to [their] conclusions." *Blair ex rel. S.T.*

*v. Kijakazi*, 2022 WL 17726857, at *4 (D.D.C. Dec. 14, 2022). An ALJ need not engage exhaustively with every shred of evidence in the record, but the ALJ cannot wholly ignore evidence contrary to their conclusions. *Ferguson v. Kijakazi*, 640 F. Supp. 3d 125, 133 (D.D.C. 2022).

## DISCUSSION

Ms. M's arguments for reversal focus on the ALJ's functional-equivalence analysis at step three. She says the ALJ's findings across four of the six functional domains are unsupported by substantial evidence, including because the ALJ did not sufficiently explain how the evidence led to the ultimate findings and because the ALJ failed to engage with at least some relevant evidence at all. The Commissioner insists otherwise, arguing that Ms. M's case boils down to a disagreement with how the ALJ chose to weigh the relevant evidence, which cannot justify reversal. From the Court's vantage, the Commissioner is not entirely incorrect: some of Ms. M's arguments are fairly characterized as entreaties to reweigh evidence that the Commissioner considered and reasonably explained. But in at least a few critical ways, the Court agrees with Ms. M and concludes the ALJ did not build an adequate explanatory bridge from the evidence to their findings. The Court addresses each of the relevant areas of functioning in turn.

**I.    Acquiring and Using Information**

Start with acquiring and using information. For purposes of this area of functioning, the regulations contemplate that school-age children "should be able to learn to read, write, and do math, and discuss history and science." 20 C.F.R. § 416.926a(g)(2)(iv). Limitations in this domain can include difficulties in understanding words, remembering lessons from school, solving math problems, and communicating in more complicated sentences. *Id.* § 416.926a(g)(3).

Here, the ALJ began with several pages summarizing a swath of relevant evidence. (AR at 28–31.) But the ALJ's ensuing engagement with that evidence was scant to say the least. (*Id.* at

9

31.) Across a few sentences, the ALJ stated that MM's test scores "support[ed] some impairment," without any further explanation; seemingly credited evidence showing that MM could "follow one and two step oral instructions" and "perform school work" with the help of a "tablet device to communicate"; and recognized that MM received accommodations through an IEP, but opined that MM's records did not show she was "unable to access, acquire, and use information in an age appropriate manner." (*Id.*) Based on that analysis alone, the ALJ concluded: "The several psychological evaluation reports, the intelligence testing, and the IEP documents support 'less than marked' limitations in this area of functioning." (*Id.*) This comes up short in building a "logical bridge from the evidence to [the] conclusion." *Lane-Rauth*, 437 F. Supp. 2d at 67 (citation and quotation marks omitted); *see also Butler*, 353 F.3d at 1000 (explaining in a similar context that an ALJ must provide a "narrative discussion identifying the evidence that supports each conclusion") (quotation marks omitted). Although the Court can discern, at least in broad strokes, the categories of evidence the ALJ considered in evaluating this area of functioning, the ALJ did not explain how they weighed that evidence, why they credited certain evidence over other evidence, and so on. As other courts in this District have recognized, "briefly mentioning the selected evidence and crediting some of that evidence with only minimal explanation is insufficient." *Blair*, 2022 WL 17726857, at *3 (cleaned up) (quoting *Bethel*, 2019 WL 12251881, at *8). But that is all that happened here. Put another way, it seems that the "weighing of the evidence took place inside the ALJ's head." *Id.* at *4 (quoting *Bethel*, 2019 WL 12251881, at *9). And while that shortcoming typically necessitates remand as a general matter, that result strikes the Court as especially appropriate on this point for two reasons.

The first relates to MM's BDI-2 scores. In summarizing the evidence, the ALJ mentioned that the BDI-2 scores "indicated low average functioning in the adaptive domain, and significantly

10

delayed in the personal-social and cognitive domain." (AR at 28.) But more than that, and as Plaintiff stresses (*see* Pl.'s Reply at 3), the specific BDI-2 score for MM's cognitive functioning was in the 0.3rd percentile, putting MM more than two standard deviations below the mean (AR at 856). The SSA's regulations acknowledge that scores this low can be indicative of at least a marked limitation. 20 C.F.R. § 416.926a(e)(2)(i) (explaining that a "marked" limitation "is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean"); *see also, e.g.*, *Boyington ex rel. J.O.J.H. v. Colvin*, 48 F. Supp. 3d 527, 531 (W.D.N.Y. 2014) (finding a marked limitation in acquiring and using information where "BDI–2 test results for the cognitive domain" were "precisely two standard deviations below the mean" and "consistent with [the child's] day-to-day performance"). But the ALJ did not engage with this specific aspect of MM's test scores, certainly not as part of any concrete discussion explaining why the evidence reflected a "less than marked" limitation all the same. And although no single test score alone will be dispositive, *see* 20 C.F.R. § 416.926a(e)(4)(i), the BDI-2 scores appear at least somewhat consistent with other evidence. For instance, MM's inattention on a WJ-IV test administered in 2021 led one evaluator to remark that MM's academic ability could be "extremely low"; in that context, "extremely low" equates to a test score lower than 70, which would be at least two standard deviations below the mean. (AR at 32, 1076, 1468.) As another example, the BDI-2 score seems consistent with MM's second-grade IEP, which indicates that "she has significant communication and cognitive delays." (*Id.* at 28, 591–93.) This is not to say that the record evidence, considered holistically, necessarily points to a marked limitation in this area. For instance, MM achieved a score of 71 on an earlier WJ-IV test, within two standard deviations from the mean (albeit barely). (*Id.* at 1076–77.) Other nonverbal intelligence assessment scores showed MM closer to the average. (*See id.* at 31.) And the

11

Commissioner points to other evidence still. (*See* Def.'s Mem. at 19–20.) So, on balance, the ALJ could conceivably conclude that other evidence outweighs MM's BDI-2 scores. But there is nothing in the ALJ's decision that reflects any sort of considered assessment along these lines.

  The Court's other concern centers on whether the ALJ appropriately assessed MM as a "whole child" for purposes of this area of functioning, by considering whether "any given impairment may have effects in more than one domain." 20 C.F.R. § 416.926a(c). For example, the SSA has recognized that "learning disorders" (such as ADHD) and "anxiety disorders" (such as selective mutism) may affect a child's ability to "perform learning-related tasks at school," which impacts both the domain of acquiring and using information and the domain of attending and completing tasks. SSR 09-3P, 2009 WL 396025, at *2. Here, the ALJ noted that some of the evidence—including MM's academic success and test results—may have been skewed by MM's ADHD, selective mutism, and low persistence. The ALJ acknowledged, for instance, that MM's academic achievement "appeared to fall below age expectations" but opined that it may be "largely due to inattention and low persistence," and the ALJ similarly observed that MM's "selective mutism, poor persistence, short attention span, and unwillingness to participate during portions of the testing may skew her test results" on intelligence-related assessments. (AR at 31.) These statements reflect that the ALJ considered, at least in some sense, MM's various impairments. But they do not show precisely how the ALJ did so. In other words, the Court cannot tell whether the ALJ discounted the severity of any limitation in this domain based on MM's other referenced impairments, as Ms. M argues (*see* Pl.'s Mem. at 12), or whether the ALJ appropriately considered "the interrelation between the domains" and MM as a "whole child," as the Commissioner rejoins (*see* Def.'s Mem. at 20 n.1). The former approach would be improper; the latter would not. But

12

again, the absence of any developed analysis or discussion on this point—*i.e.*, the ALJ's failure to adequately explain the treatment of this evidence—hampers any meaningful review.

All told, because the ALJ did not sufficiently and meaningfully explain how they weighed the relevant evidence, including as to the two specific areas just discussed, the Court cannot conclude that substantial evidence supports the ALJ's finding in this domain.

**II.     Attending and Completing Tasks**

Turn to the domain of attending and completing tasks. In this area of functioning, the regulations contemplate that school-age children should be able to follow directions, complete schoolwork, and sustain focus to "participate in group sports," read alone, and do chores. 20 C.F.R. § 416.926a(h)(2)(iv). Examples of limitations in this area include being easily distracted, "slow to focus" on activities of interest, and giving up on tasks out of frustration. *Id.* § 416.926a(h)(3).

Here, the ALJ began by cataloguing various aspects of the record, including Ms. M's testimony, observations from MM's teachers and evaluators, MM's diagnosis of ADHD, and other records concerning some of MM's activities. But as above, after walking through those pieces of evidence, the ALJ's only explanatory effort to synthesize and weigh that evidence was entirely conclusory: "Based on the IEP accommodations, the psychological examination reports, the mental status examinations, the remarks from the evaluating mental health practitioners, and [Ms. M's] testimony, the undersigned finds less than marked[] limitation in this area of function." (AR at 32.) Again, this passage summarizes the evidence the ALJ reportedly considered but says virtually nothing about *how* the ALJ considered it, why the evidence supported a finding of a "less than marked" limitation, and so on. More was required to build the necessary analytical bridge. *Blair*, 2022 WL 17726857, at *3; *Bethel*, 2019 WL 12251881, at *8.

In addition, the Court shares Ms. M's concern that the ALJ may have placed undue emphasis on MM's capacity to focus on a small set of enjoyable activities rather than evaluating MM's capabilities overall. (*See* Pl.'s Reply at 7.) As the applicable regulations explain, school-age children "should be able to focus [their] attention in a *variety* of situations" including schoolwork and chores. 20 C.F.R. § 416.926a(h)(2)(iv) (emphasis added). More, and relevant here, Social Security Ruling 09-4P cautions that children with ADHD can often exhibit something called "hyperfocus"—"an intense focus on things that interest them, such as video games"—" but be limited in their ability to focus on other tasks." SSR 09-4P, 2009 WL 396033, at *3. The ALJ acknowledged MM's ADHD diagnosis, but there is no indication that the ALJ considered the possibility that MM may have been exhibiting "hyperfocus" on certain types of activities. And that seems particularly notable considering the weight the ALJ appears to have placed on MM's ability to "play video games" and participate in "arts and crafts"—both activities that MM presumably finds interesting and enjoyable. *See, e.g.*, *Claudio ex rel. E.P.I.C. v. Comm'r of Soc. Sec. Admin.*, 2022 WL 6255608, at *16 (N.D. Ohio Aug. 5, 2022) (finding "the ALJ did not provide a sufficient analysis of this domain" even where the child "could pay attention when doing activities he enjoys, such as arts and crafts and playing video games"), *report and recommendation adopted*, 2022 WL 4395399 (N.D. Ohio Sept. 23, 2022); *Estep v. Comm'r of Soc. Sec.*, 2017 WL 4334195, at *5 (S.D. Ohio Sept. 30, 2017) ("Social Security Ruling 09-4P indicates that reliance on the ability to focus on playing video games may be misplaced[.]"). *But see Musgraves ex rel. MMM v. Colvin*, 2013 WL 4455626, at *3 (W.D. Mo. Aug. 16, 2013) (finding that "stay[ing] busy playing [video games] for hours" supported a conclusion of less than marked limitation).

Meanwhile, and as Ms. M highlights (Pl.'s Mem. at 18–19), the record includes other evidence demonstrating MM's difficulties focusing and completing tasks. For instance, on one

14

occasion, MM could not even finish a WJ-IV test: "[s]he attempted tasks for less than five minutes before refusing to respond." (*Id.* at 32, 1477.) One of MM's psychological examinations indicated that MM "does not demonstrate the attention necessary to perform across settings and these behaviors are perceived as interfering with her functioning at school and home." (*Id.* at 1081.) And as the ALJ noted, Ms. M testified that MM "could not keep busy on her own, finish what she starts, and could not complete homework or chores." (*Id.* at 32.) The ALJ mentioned and seemingly relied on this evidence but did not meaningfully explain why it did not indicate a more pronounced limitation in this area of functioning. As best the Court can discern, the ALJ seems to have simply credited MM's ability to engage in and focus on certain enjoyable activities, *i.e.*, video games and arts and crafts. For the reasons explained, the ALJ's concentration on those points, especially without considering—or even mentioning—the potential "hyperfocus" implications associated with MM's ADHD diagnosis, is not sufficient to support the ALJ's finding in this domain.

### III.  Interacting and Relating with Others

Next up, the functional domain of interacting and relating with others. This domain considers a child's ability to "initiate and sustain emotional connections with others," including by engaging in various social interactions and forming "intimate relationships." 20 C.F.R. § 416.926a(i)(1). School-age children should be "able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand." *Id.* § 416.926a(i)(2)(iv). Limitations in this area can include "difficulty communicating with others" and "difficulty speaking intelligibly," among others. *Id.* § 416.926a(i)(3).

The ALJ's analysis in this area was more explanatory than the two domains just discussed. The ALJ summarized the relevant evidence, as before, including in this instance Ms. M's testimony concerning MM's capabilities at home and elsewhere, MM's selective mutism diagnosis, the

15

results of MM's psychological and speech-language evaluations, and more. (AR at 32–33.) This time around, though, the ALJ went on to synthesize the relevant evidence in a manner that reasonably explained the finding of a "less than marked" limitation. In considering Ms. M's testimony, the evaluation results, and other evidence, the ALJ determined that the record showed that MM demonstrated an "age[-]appropriate ability to communicate non-verbally" in a school setting and a "normal capacity to speak with family" in a home setting. (*Id.* at 33.) In other words, the ALJ considered MM's selective mutism diagnosis and her non-verbal style of communicating capably with teachers and peers at school—including through gestures, signs, and an adaptive device—but weighed that evidence against MM's "normal" ability to communicate verbally with family outside of school. (*See id.* (describing Ms. M's testimony as reflecting that MM "spoke fluently with her immediate family, including uncles and aunts," and that "from the time [MM] arrives home from school on the bus until bedtime, [MM] 'talks all the time'").) And the Court can discern the nature of that analysis because the ALJ reasonably showed their work. Although Ms. M may disagree with the way the ALJ weighed the relevant evidence, that mere disagreement cannot carry the day. *See, e.g.*, *Callaway v. Berryhill*, 292 F. Supp. 3d 289, 298 (D.D.C. 2018) ("[I]t is not th[e] Court's job to second-guess the ALJ by reweighing the evidence[.]"). And Ms. M does not otherwise identify any contrary evidence that the ALJ arguably ignored.

In sum, the ALJ articulated an appropriate analytical bridge from the evidence to their conclusion in this area, and the Court finds that substantial evidence supports the ALJ's finding.

## IV.     Health and Physical Well-Being

That leaves the domain of health and physical well-being. This functional area measures "the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on [a child's] functioning." 20 C.F.R. § 416.926a(*l*). The regulations recognize that a

child "may experience physical effects that interfere with [their] functioning in any or all of [their] activities." *Id.* § 416.926a(*l*)(3). Examples of limited functioning in this area include "generalized symptoms," "somatic complaints," treatment-related "limitations in … physical functioning," impairment-related "exacerbations … that interfere with ... physical functioning," or being "medically fragile" or requiring "intensive medical care." *Id.* § 416.926a(*l*)(4).

As to this domain, too, the Court sees no basis to upset the ALJ's determination that MM exhibited a "less than marked" limitation. The ALJ addressed MM's various impairments and discussed the relevant evidence, including MM's medical records and Ms. M's testimony, and determined that MM's conditions "remain controlled with medication management and appropriate medical follow-up." (AR at 35; *see id* at 34 (noting that while MM's "asthma affects [MM's] ability to function, the condition responds to medication, when appropriately administered"); *see also id.* (similar as to MM's dermatitis and eczema).) Put differently, in interpreting the evidence on this point, the ALJ reasonably explained the analysis: despite MM's health issues, the ALJ found MM's limitation in this domain to be "less than marked" because MM's conditions largely responded to treatment and were manageable on a day-to-day basis. (*See id.* at 34–35.) Against that backdrop, Ms. M argues why she believes the Court should construe the evidentiary record differently, particularly as to MM's asthma-related limitations. (Pl.'s Mem. at 20–22; Pl.'s Reply at 8.) But that is not the Court's role. And aside from an invitation to reweigh the evidence, Ms. M does not identify any countervailing evidence that the ALJ wholly ignored. On review, the Court is satisfied the ALJ's "less than marked" finding in this area of functioning was supported by substantial evidence and reasonably explained.[7]

---

[7] Insofar as Ms. M argues there was "substantial evidence demonstrating" that MM's asthma triggers at least a marked limitation in this area (Pl.'s Reply at 8), this inverts the governing standard. After all, the Court asks whether substantial evidence—"more than a scintilla … but less than a preponderance, *Butler*,

17

\* \* \*

To sum up, in two of the four challenged domains relevant to the ALJ's functional-equivalence analysis—acquiring and using information, and attending and completing tasks—the ALJ did not sufficiently explain how they weighed the relevant evidence to reach the resulting findings. As to the other two domains—interacting and relating with others, and health and physical well-being—the ALJ's findings pass muster under a "substantial evidence" lens.

## V.     Remand for Further Proceedings is Appropriate

As a final point, the Court considers what comes next. For her part, Ms. M implores the Court to make an affirmative finding in her favor on the functional-equivalence issue and remand with a directive to award benefits. (Pl.'s Mem. at 22–23.) Courts in this District have taken that approach in a limited and narrow category of cases: "where the evidence on the record as a whole is clearly indicative of disability and additional hearings would serve no purpose other than to delay the inevitable receipt of benefits." *Perkins v. Berryhill*, 379 F. Supp. 3d 1, 7–8 (D.D.C. 2019) (quoting *Espinosa v. Colvin*, 953 F. Supp. 2d 25, 36 (D.D.C. 2013)). This is a "high bar," *id.*, and where it is not cleared, the ALJ should be permitted to "decide anew whether the claimant should be awarded benefits," *Tymeka J. ex rel. S.C. v. Kijakazi*, 2023 WL 4892885, at *10 (D.D.C. June 22, 2023), *report and recommendation adopted*, 2023 WL 9848661 (D.D.C. July 25, 2023).

Applying these principles here, the Court concludes that a remand for further proceedings—rather than a remand to award benefits—is warranted. Although the ALJ did not fully explicate the necessary analysis at certain junctures and neglected to address at least some relevant aspects of the evidence altogether, the Court simply cannot say that the record is "clearly

---

353 F.3d at 999—supports the ALJ's conclusion, not whether substantial evidence could support a different conclusion. This sort of argument, at least as framed, is just another gloss on reweighing the evidence.

18

indicative of disability." *Perkins*, 379 F. Supp. 3d at 8. But given the points discussed, the ALJ could determine on remand that MM exhibits at least "marked" limitations in two of the relevant domain areas, which would support a finding of disability under a functional-equivalence approach. Accordingly, the most appropriate path forward is a remand for further proceedings to allow the ALJ to reconsider the record in a manner consistent with this opinion.

## CONCLUSION

For the reasons explained, the Court **GRANTS** Ms. M's motion for judgment for reversal (ECF No. 24) and **DENIES** the Commissioner's motion for judgment of affirmance (ECF No. 26). The Court **REMANDS** this matter to the SSA pursuant to sentence four of 42 U.S.C. § 405(g) for proceedings consistent with this opinion. The Court will issue a separate order so stating.

Dated: February 24, 2026

                                                                           MATTHEW J. SHARBAUGH
                                                                           United States Magistrate Judge